Ronald A. Nimkoff (RN 4598)
THE NIMKOFF FIRM
Attorneys for Defendants
One Pennsylvania Plaza, Suite 2424
New York, New York  10119
(212) 868-8100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL HARTSTEIN also known as MOSHE HARTSTEIN,<br><br>                                 Plaintiff<br>                        -against-<br><br><br>SOLOMON SHARBAT, SOLOMON CAPITAL LLC, SOLOMON SHARBAT as TRUSTEE FOR SOLOMON CAPITAL LLC 401 TRUST AND SOLOMON CAPITAL CAPITAL LLC 401 K TRUST,<br><br>                                 Defendants | 09 Civ. 9799 (RMB)<br><br>**DEFENDANTS' ANSWER AND COUNTERCLAIM**S<br><br><br>**TRIAL BY JURY DEMANDED**      |

Defendants  Solomon Sharbat, Solomon Capital LLC, Solomon Sharbat as trustee for Solomon Capital 401K Trust s/h/a Solomon Sharbat as Trustee for Solomon Capital LLC 401 K Trust and Solomon Capital 401K Trust s/h/a Solomon Capital LLC 401 K Trust (collectively, "Defendants") for their answer to the complaint dated October 23, 2009 ("Complaint") of plaintiff Michael Hartstein ("Plaintiff"):

1.  Deny the averments of the preliminary statement and paragraphs 34 and 43 thereof, except state that Solomon Sharbat signed the documents that are attached to the Complaint as Exhibits A and B.

2.  Deny knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 1 thereof.

3.  Deny the averments of paragraphs 3, 6-15, 17-19, 22, 23, 25-27, 29-32, 35-36, 38-40, 42, 44-48, 51-53 thereof.

4.  Deny the averments of paragraph 5 thereof, except state that Solomon Capital 401K Trust is a retirement trust established under 26 U.S.C. § 401(k) and that Solomon Sharbat is its sole trustee.

5.  Deny the averments of paragraph 16 thereof, except deny knowledge or information sufficient to form a belief as to what the value was of 600,000 shares of "said publicly traded company" on September, 10, 2009 or at the "present time."

6.  Deny the averments of paragraphs 20 and 21 thereof, except deny knowledge or information sufficient to form a belief as to what Plaintiff believes.

7.  Deny the averments of paragraph 50 thereof, except state that Solomon Sharbat is the sole trustee and beneficiary of  Solomon Capital 401K Trust.

8.  Deny the averments of paragraph 54 thereof, except deny knowledge or information sufficient to form a belief as to what Plaintiff requests.

DEFENSES

The assertion of any defense hereinafter does not mean that Defendants/Counterclaimants assume the burden of proof of any issue as to which applicable law places the burden upon Plaintiff.  Defendants' expressly reserve the right to amend and/or supplement their defenses.

## FIRST DEFENSE

9.      This Court does not have personal jurisdiction over Defendants as Plaintiff has failed to effect service of process.

10.      By reason thereof, the Complaint should be dismissed.

## SECOND DEFENSE

11.      The Complaint fails to state a claim upon which relief can be granted.

12.      By reason thereof, the Complaint should be dismissed.

## THIRD DEFENSE

13.      The terms of the loans on which Plaintiff purports in the Complaint to seek repayment include usurious rates of interest.

14.      By reason thereof, the Complaint should be dismissed.

## FOURTH DEFENSE

15.      The loans on which Plaintiff purports in the Complaint to seek repayment have been re-paid and/or have been offset by monies due and owing from Plaintiff to Defendants.

3

16.     By reason thereof, the Complaint should be dismissed.

FIFTH DEFENSE

17.     Plaintiff does not have standing to assert the second and sixth "causes of action" set forth in the Complaint.

18.     By reason thereof, the second and sixth "causes of action" of the Complaint should be dismissed.

SIXTH DEFENSE

19.  Plaintiff does not have a private right of action with respect to the second and sixth "causes of action" set forth in the Complaint.

20.  By reason thereof, the second and sixth "causes of action" of the Complaint should be dismissed.

SEVENTH DEFENSE

21.  The fourth "cause of action" of the Complaint does not plead fraud with the particularity required by Fed. R. Civ. P. 9(b).

22.  By reason thereof, the fourth "cause of action" of the Complaint should be dismissed.

EIGHTH DEFENSE

23    The Complaint fails to name one or more parties who were required to be named in accordance with Fed. R. Civ. P. 19.

4

24.     By reason thereof, the Complaint should be dismissed.

<u>NINTH DEFENSE</u>

25.     The second "cause of action" is barred  by the release doctrine.

26.     By reason thereof, the second "cause of action" of the Complaint should be dismissed.

<u>COUNTERCLAIMS</u>

Defendants-Counterclaimants Solomon Sharbat, Solomon Capital LLC, Solomon Sharbat as trustee for Solomon Capital 401K Trust s/h/a Solomon Sharbat as Trustee for Solomon Capital LLC 401 K Trust and Solomon Capital 401K Trust s/h/a Solomon Capital LLC 401 K Trust (one or more which are hereinafter referred to as "Defendants") for their counterclaims aver, on knowledge with respect to their own actions and the statements of others, and on information and belief with respect to the actions and status of others:

<u>PARTIES</u>

27.  Plaintiff Michael Hartstein ("Hartstein") is an individual who resides in the State of New York.

28.  Hartstein is a broker dealer, a member of the Financial Industry Regulatory Authority ("FINRA") and a provider of investment advisory services.

29.   Hartstein is an affiliate and director of the investment advisor, Palladium

Capital Advisors, LLC ("Palladium"). Palladium is a Delaware limited liability company,

a broker-dealer, and a member of FINRA.

30.   Solomon Sharbat ("Sharbat") is an individual who resides in the State of New

York.

31.   Solomon Capital LLC is a New York Limited Liability Company.

32.   Solomon Capital 401K Trust s/h/a Solomon Capital LLC 401 K Trust is a

qualified retirement trust. Sharbat serves as the trustee for the trust.

33.   At all relevant times, Hartstein acted as Defendants' broker and investment

advisor.


## COUNTERCLAIM I

UNAUTHORIZED TRADING AND SECURITIES FRAUD UNDER 17 C.F.R §
240.10b-5

34.   Defendants repeat and reaver the averments set forth in the above paragraphs.

35.   On or about August 20, 2009, Sharbat discussed with Hartstein that an

individual by the name of Marcus S. Butler ("Butler") sought to obtain $600,000 from

Defendants in connection with a certain business opportunity.  The opportunity involved

the purchase of shares of SpongeTech Delivery Systems Inc. ("SpongeTech") and Vanity

Events Holding, Inc. ("Vanity").  Hartstein knew Butler and was familiar with the terms

of the deal. The terms (among others) being: Butler promised that, if Defendants provided the $600,000 to his company, MSB Group, Incorporated so that he could purchase shares in SpongeTech and Vanity, Defendants would be repaid the $600,000 and would be entitled to share in any profits generated from the purchase of the SpongeTech and Vanity shares (the "Butler Deal").

36. Hartstein advised, and strongly encouraged, Defendants to provide the $600,000 to Butler, advising that the business opportunity would ultimately be profitable for Defendants.

37. Defendants later learned that Hartstein had a personal pecuniary interest in the funds that Defendants were to loan to Butler, but never disclosed his personal pecuniary interest to Defendants.

38. In fact, to tap that personal pecuniary interest without Defendants learning of it, Hartstein, together with his friends and/or family, created a Delaware company with the identical name, MSB Group, Incorporated, as the name of the company that Butler owned. Hartstein never disclosed to Defendants that he had a pecuniary interest in MSB Group, Incorporated.

39. On or about August 24, 2009, in reliance on Hartstein's advice and encouragement, Defendants authorized Hartstein to sell certain shares that Defendants already owned in SpongeTech so that the proceeds of the SpongeTech sale could be loaned to MSB Group, Incorporated.

7

40.  Accordingly, Defendants expressly instructed, and authorized, Hartstein to sell (i) 2 million shares of SpongeTech right away at market value and (ii) an additional 3 million shares of SpongeTech at a sales price of 20 cents per share or greater.

41.  With respect to the latter 3 million shares of SpongeTech, Defendants made it clear to Hartstein that, if he could not sell those shares for 20 cents per share or at a higher price, he should not sell them at all.

42.  Hartstein represented to Defendants that he would sell the SpongeTech shares in strict accordance with Defendants' instructions.  However, at the time that Harstein made such representation, he had no intention to do so, but at all times, intended to sell all of Defendants' SpongeTech shares so that he could benefit personally from the proceeds of all the shares.

43.  The communications between Defendants and Hartstein took place by telephone, through emails and by other means.

44.  Hartstein also stated that, because it would take a few days for Defendants to receive the proceeds from the sale of SpongeTech (because the transaction would need to "process"), he would "front" to Defendants and/or Butler "from his own pocket" the amount earned on the sale of the SpongeTech shares on the same day the shares were sold.  Hartstein ultimately did "front" certain proceeds from his sale of the SpongeTech shares.

45.  Defendants made the 5 million shares of SpongeTech available to Hartstein to

sell in reliance upon Hartstein's representation that he would sell the shares in strict compliance with their directions.

46.  Over the course of the parties' business relationship, Defendants at no time authorized  Hartstein to exercise independent control over brokerage accounts or stock owned by Defendants.

47.  On or about August 25, 2009, Hartstein, in defiance of Defendants' instructions, proceeded to sell all 5 million shares of SpongeTech "right away" at 15.75 cents per share.  Hartstein knowingly and intentionally sold the shares in a manner in which he was not authorized to sell them.

48.  By selling all 5 million shares of SpongeTech (rather that the authorized portion (2 million shares)) right away at 15.75 cents, Hartstein effected a transfer that generated enough capital to meet Butler's desired funding request (in which Hartstein had a personal pecuniary interest) made to Defendants.

49.  Had Defendants known that Hartstein had an interest in the deal with Butler, they would not have accorded weight to, and acted upon, Hartstein's advice that they sell their SpongeTech shares so that the proceeds could be forwarded to MSB Group, Incorporated and would not have permitted Hartstein to handle the sale of those shares.

50.  Had Defendants known that Hartstein would disregard their instructions in selling their SpongeTech shares, they never would have permitted him to access and sell the shares.

51.  Had Hartstein not knowingly deceived Defendants about how he would sell the 5 million shares of SpongeTech, Defendants would have sold the latter 3 million shares of SpongeTech at a higher price.  In fact, SpongeTech shares traded at more than 20 cents within days after Harstein sold Defendants' 5 million shares at 15.75 cents per share.

52.  Upon learning of the unauthorized sale, Defendants communicated to Hartstein that his unauthorized actions were unacceptable to them and that Hartstein was liable to them for losses incurred in connection with the unauthorized trade.

53.  As a result of the unauthorized transfer of securities, Defendants suffered compensatory damages in the amount of, at minimum, $128,000.  Accordingly, Hartstein is liable to Defendants for compensatory damages in the amount of at least $128,000 and for punitive damages in an amount in excess of $1,000,000.

<u>COUNTERCLAIM II</u>

COMMON LAW FRAUD

54.  Defendants repeat and reaver the averments set forth in the above paragraphs.

55.  Hartstein knowingly made the material misrepresentations and omissions set forth above in connection with his sale of Defendants' SpongeTech stock.

56.  With respect to the omissions (*i.e.*, his personal pecuniary interest in the Butler Deal), Hartstein had a duty to make disclosures to Defendants.

57.  Hartstein's omissions were integral for purposes of positioning Defendants to

make an informed decision as to, among other things, whether they should allow him to sell 5 million shares of SpongeTech for them.

58.  Hartstein acted with the intent to deceive Defendants.

59.  Defendants reasonably relied on Hartstein's material misrepresentations in making the 5 million shares of SpongeTech available to him and for sale.

60.  Defendants' reliance on Hartstein's material misrepresentations and omissions were the proximate cause of his being damaged in the amount of at least $128,000. Accordingly, Hartstein is liable to Defendants for compensatory damages in the amount of at least $128,000 and for punitive damages in an amount in excess of $1,000,000.

COUNTERCLAIM III

CONVERSION

61.  Defendants repeat and reaver the averments set forth in the above paragraphs.

62.  Following the unauthorized transfer of all 5 million SpongeTech shares, Hartstein unilaterally opted to pay himself a "fee" in the amount of $75,000 for effecting the unauthorized sale.

63.  The sale of the 5 million SpongeTech shares at 15.75 per share generated $787,500  Hartstein withheld $75,000.00 of said funds for himself in violation of Defendants' wishes and industry regulations.

64.  The amount of $75,000 does not represent reasonable remuneration for the service provided.

65. Defendants had an immediate and superior right of possession to the $75,000.

66. Hartstein exercised unauthorized dominion over the $75,000 in failing to return it and in keeping it for himself.

67. As a result, Defendants suffered damages amounting to, at minimum, $75,000.

COUNTERCLAIM IV

CONVERSION

68. Defendants repeat and reaver the averments set forth in the above paragraphs.

69. In addition to the $75,000 "fee," Harstein kept for himself another $115,000 from the proceeds of  the sale of the 5 million shares of SpongeTech ($787,500), claiming that Solomon Capital LLC owed him $115,000 and that, therefore, he would simply retain another $115,000 from the $787,500 proceeds.

70. Hartstein kept the $115,000 sum even though Sharbat explained to Hartstein that, even if Solomon Capital LLC did owe him $115,000, it was Solomon Capital 401K Trust, and not Solomon Capital LLC, whose SpongeTech shares were sold and that the proceeds from the sale needed to be deposited back in Solomon Capital 401K Trust's account.

71. Nevertheless, Hartstein refused to deposit the $115,000 sum (among other monies) in Solomon Capital 401K Trust's account.

72. Solomon Capital LLC 401 K Trust had an immediate and superior right of possession to the $115,000.00.

73.  Hartstein exercised unauthorized dominion over the $115,000.00 in failing to return it and in keeping it for himself.

74.  As a result, Solomon Capital 401K Trust has suffered damages amounting to, at minimum, $115,000.00.

<u>COUNTERCLAIM V</u>

BREACH OF CONTRACT

75.  Defendants repeat and reaver the averments set forth in the above paragraphs.

76.  In or around July 2009, Defendant and Hartstein partnered on a deal/entered into a joint venture agreement to invest in a company Bioelectronics Corp.

77.  The goal was to locate profitable investment opportunities in the growing company so that they "get in" at a favorable price.

78.   Defendants agreed to attempt to find individual(s) at Bioelectronics Corp. selling stock at a price below market value.

79.  Hartstein agreed (consistent with his fiduciary duties) that he would use Defendants exclusively for the purpose of locating such individuals at Bioelectronics Corp.

80.  Hartstein agreed that when Defendants located such an individual, he would provide the funds for the purchase of the stock, structure the purchase and purchase the stock.

81.   The parties agreed that they would equally split any gross profits earned when

13

the Bioelectronics stock was eventually sold/when they alienated the interest in the growing company.

82.  Hartstein not only agreed to provide to Defendants 50% of the gross profits from the sale of the Bioelectronics stock he came to own, but also 50% of the gross profits on the sale of any Bioelectronics stock that he previously owned.

83.  Hartstein sent an email to Sharbat acknowledging that the parties were 50% partners in the Bioelectronics deal.

84.  Defendants fully performed their obligations under the agreement. Defendants ultimately found an individual at Bioelectronics Corp. willing to sell 10 million shares of his Bioelectronics Corp. stock at a price, per share, below market value. Defendants introduced this individual to Hartstein.

85.  Hartstein purchased/provided the money for the 10 million shares.

86.  Hartstein then breached the agreement by, among other things, failing to provide to Defendants (i) 50% of the profits earned on the sale of the 10 million shares and/or any portion thereof and (ii) 50% of the profits earned on the sale of other Bioelectronics shares.

87.  Hartstein further breached the agreement by, among other things, using Defendants' contacts and others, and not Defendants, to purchase Bioelectronics shares.

88.  As a result of these breaches, Defendants suffered losses in an amount to be determined at trial, but believed to be in the amount of at least $244,000.

14

## COUNTERCLAIM VI

BREACH OF CONTRACT

89.  Defendants repeat and reaver the averments set forth in the above paragraphs.

90.  In or around September 2009, Hartstein and his business colleague Barry Honig scheduled a lunch with Sharbat, indicating that they wanted to give him investment advice and tell him about investment opportunities.

91.  At the lunch, Hartstein explained to Sharbat that he was raising money/seeking invesment capital for a startup company known as Reach Messaging.

92.  Hartstein explained to Sharbat that he was looking to raise investment capital for Reach Messaging in the amount of  $250,000 and if Defendants located an investor that ultimately invested that amount in Reach Messaging, Defendants would receive $250,000 worth of shares in Reach Messaging.

93.  Sharbat proposed a potential investor right then and there, namely,  Joel Schriber ("Schriber"). Sharbat  had conversations with Schriber about investing in Reach Messaging.

94.  After Hartstein developed a dialogue with Schriber,  he excluded Defendants from everything having to do with his dealings with Schriber.

95. Schriber invested in Reach Messaging and Hartstein, contrary to his promise and agreement with Defendants, never provided to Defendants any shares in Reach Messaging for finding an investor for the company.

15

96.  As a result Defendants have suffered damages in an amount to be determined at trial, but believed to be in excess of $250,000.

## COUNTERCLAIM VII

## BREACH OF FIDUCIARY DUTY

97.  Defendants repeat and reaver the averments set forth in the above paragraphs.

98.  In the Summer of 2009, Hartstein aggressively encouraged Defendants to invest in Optex Systems Holdings, Inc. ("OPSX"), Conspiracy Entertainment Holdings, Inc., ("CPYE") and Hepa Life Techs ("HPLF").

99.  On Harstein's advice, Defendants purchased shares in these companies.

100.  These stocks were thinly traded and unbeknownst to Defendants, Hartstein and/ or Hartstein's friends and/or Harstein's family owned the shares in these companies, such that when Defendants ultimately agreed to purchase shares, Defendants were, in effect, purchasing shares that belonged to Hartstein and/or Hartstein's friends and/or Hartstein's family.

101. Defendants have lost money in connection with the aforementioned investments.

102.  Hartstein had fiduciary duties to Defendants arising out of his role as Defendants' (i) broker and (ii) investment advisor.

103.  Hartstein had fiduciary duties to Defendants due to the nature of the parties' relationship, which was, among other things, trusting and confidential.

16

104.  Hartstein breached his fiduciary duties to Defendants in involving them in investments in companies and pitching said companies without disclosing that he and/or his family and/or his friends stood to gain from Defendants' participation in the investment opportunity.

105.  To date, Defendants have suffered losses in an amount to be determined at trial but believed to be in excess of $25,000 in connection with the aforementioned investments.

## COUNTERCLAIM VIII

### BREACH OF FIDUCIARY DUTY

106.  Defendants repeat and reaver the averments set forth in the above paragraphs.

107.  Hartstein breached his fiduciary duties to Defendants when he (i) made misrepresentation to Defendants regarding how he would handle the sale of their 5 million SpongeTech shares, (ii) withheld information concerning his connection to Butler, and (iii) executed unauthorized trades in connection with the 5 million shares of SpongeTech, to Defendants' detriment.

108.  As a result of the breach, to date, Defendants have suffered losses in an amount of at least $128,000.

COUNTERCLAIM IX

BREACH OF FIDUCIARY DUTY

109.  Defendants repeat and reaver the averments set forth in the above paragraphs

110.  Hartstein breached his fiduciary duties to Defendants when he failed to turn over to them and retained for himself $75,000, which was generated from the sale of Defendants' SpongeTech shares.

111.  As a result of the breach, to date, Defendants have suffered losses in the amount, of at least, of $75,000.

COUNTERCLAIM X

BREACH OF FIDUCIARY DUTY

112.  Defendants repeat and reaver the averments set forth in the above paragraphs.

113.  Hartstein breached his fiduciary duties to Defendants by refusing to provide portions of the proceeds from the sale of the 5 million shares of SpongeTech to the 401K trust account from which the shares were sold.

114.  As a result of the breach, to date, Solomon Capital 401 K Trust has suffered losses in the amount of at least $115,000.

COUNTERCLAIM XI

BREACH OF FIDUCIARY DUTY

115.  Defendants repeat and reaver the averments set forth in the above

18

paragraphs.

116.  Hartstein breached his fiduciary duties to Defendants when he "went around their back" and used Defendants' contacts to purchase Bioelectronics stock without notifying Defendants.

117.  As a result Defendants suffered damages in an amount to be determined at trial.

<u>COUNTERCLAIM XII</u>

BREACH OF FIDUCIARY DUTY

118.  Defendants repeat and reaver the averments set forth in the above paragraphs.

119.  Harstein breached his fiduciary duties to Defendants in failing to provide to Defendants 50% of the profits earned on the sale of Bioelectronics shares.

120.  As a result of the breach, to date, Defendants have suffered damages in an amount to be determined at trial, but believed to be in the amount of at least $244,000.

<u>COUNTERCLAIM XIII</u>

BREACH OF FIDUCIARY DUTY

121.  Defendants repeat and reaver the averments set forth in the above paragraphs.

122.  Hartstein breached his fiduciary duties to Defendants by getting the name of an investor from Defendants for a particular business venture on the pretense that

Defendants would receive a fee and/or commission for finding the investor and then depriving Defendants of any fee or commission after the investor provided the desired funds.

123.  As a result of the breach, to date, Defendants have suffered losses in of an amount to be determined at trial, but believed to be in excess of $250,000.

WHEREFORE, Defendants demand a trial by jury and judgment:

(a)     dismissing the Complaint ;

(b)     on their first counterclaim for compensatory damages in the amount of at least $128,000 and for punitive damages in an amount in excess of $1,000,000;

(c)     on their second counterclaim for compensatory damages in the amount of at least $128,000 and for punitive damages in an amount in excess of $1,000,000;

(d)     on their third counterclaim for damages amounting to, at minimum, $75,000.

(e)     on their fourth counterclaim for damages amounting to, at minimum, $115,000.00;

(f)     on their fifth counterclaim for damages in an amount to be determined at trial, but believed to be in the amount of at least $244,000;

(g)     on their sixth counterclaim for damages in an amount to be determined at trial, but believed to be in excess of $250,000;

(h)     on their seventh counterclaim for an amount to be determined at trial, but believed to be in excess of $25,000;

(i)      on their eighth counterclaim for an amount of at least $128,000;

(j)      on their ninth counterclaim for the amount of at least $75,000;

(k)      on their tenth counterclaim for the amount of at least $115,000;

(l)      on their eleventh counterclaim for an amount to be determined at trial, but believed to be in the amount of at least $244,000;

(m)      on their twelfth counterclaim for an amount to be determined at trial, but believed to be in the amount of $244,000

(n)      on their thirteenth counterclaim for an amount to be determined at trial, but believed to be in the amount of $250,000;

(o)      for their costs, disbursements and attorneys' fees incurred in connection with this action

(p)      granting to Defendants such other and further relief as this Court deems to be just and proper.

Dated:   New York, New York
         December 7, 2009


THE NIMKOFF FIRM


By: _____/s/_____
          Ronald A. Nimkoff (RN 4598)

Attorneys for Defendants
One Pennsylvania Plaza, Suite 2424
New York, New York  10119
(212) 868-8100