E. David Smith
SMITH & ASSOCIATES
570 Lexington Avenue, 23rd Floor
New York, New York 10022
Tel.  212-661-7010

Attorney for Plaintiff Michael Hartstein

**UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X
MICHAEL HARTSTEIN                                              No. 09-CIV-09799
                Plaintiff

   v.                                                                                  AFFIRMATION OF
                                                                                  E. DAVID SMITH, ESQ.
SOLOMON SHARBAT, SOLOMON CAPITAL LLC.          WITH POINTS OF LAW
SOLOMON SHARBAT AS TRUSTEE FOR SOLOMON
CAPITAL LLC. 401 K TRUST AND SOLOMON CAPITAL
LLC 401 K TRUST
                   Defendants
------------------------------------------------------------------------X

       E. David Smith, Esq. affirms under the pains and penalties of perjury:

1.     I am an attorney at law duly admitted to the bar of this court and I am the attorney of record for Michael Hartstein in this matter.

2.     I make this affirmation in opposition to defendants' motion to vacate attachment and temporary restraining order and in support of plaintiff's motion to attach contained in the Order to Show Cause issued out of the Supreme Court for New York County, New York.

3.     I also make this affirmation in opposition to defendants' motion to disqualify me from representing the plaintiff in this matter.

4.     The first point that defendant makes is that the order of attachment was obtained under false pretenses and the attachment was illegal.  I would point out to the court that

there was no order of attachment issued out of the Supreme Court.  There was only a TRO issued preventing the transfer of defendants' assets pending a hearing scheduled for December 10, 2009 to determine whether an attachment should issue.   TROs are governed not by Article 62 of the CPLR, but by Article 63.   The hearing on December 10 never happened because the matter was removed to this court. The procedure in a removed case in which a TRO or attachment is made is governed by FRCP Rule 64 which basically follows the state law.  Chemical Bank v. Haseotes 13 F3d 569 (2nd Cir 1994)  The State law at provides that for an attachment to issue an undertaking should be provided for.  There is no requirement for an undertaking in CPLR Chapter 63 governing TROs although the court may provide for one.  In this case Judge Lowe struck out the place in the Order to Show Cause providing for an undertaking, which was perfectly consistent with the issuance of a TRO.  The motion to vacate the TRO in this case is not a hearing to determine whether an attachment should issue under.CPLR 6201 or to confirm that the attachment should continue.   Such a motion would require an evidentiary hearing. See C.P.L.R. §§ 6201, 6212, 6223; Davila Pena v. Morgan, 149 F.Supp.2d 91, 93 (S.D.N.Y. 2001).  That hearing has yet to be held.   See also Bank of China, New York Branch v. NBM LLC, 192 F Supp. 2d 183 (S.D.N.Y. 2002) where Judge Chin discusses the procedure in detail.  In this case the defendants' challenges to the procedure followed must fail.  I would further point out to the court that there never was any intention on the part of the plaintiff or the plaintiff's attorney to tie up more than $400,000 of defendants' moneys as security for the defendants' debt to the plaintiff.  If defendants want to give plaintiff security in the amount of $400,000.00 plaintiff is happy to release any restraint on the balance.

5.      The defendant Solomon Sharbat makes much of the fact that the plaintiff had no basis to believe that he was about to flee the country and thus made "false representations" to the Supreme Court in order to obtain the TRO.  I would point out to the court that it was not the plaintiff who made such representations, but the defendant Solomon Sharbat himself who made that representation in his e-mail to Hartstein on October 7, 2009.  Further, the process server could not serve Sharbat personally and made three attempts to serve him before making service by tack and mail.  But the most telling evidence that he was not planning to come back is that he only had a one way ticket when he left.  As Sharbat's own affidavit makes clear on November 8, 2009 he had to buy a new ticket back.  Someone "on vacation" does not buy a one way ticket.  This action had been pending since October 29, 2009 and he knew that Hartstein's process server was trying to serve him and had served him by tack and mail and the corporation was served at its office and that he had to come back to find a lawyer to defend this lawsuit and take action to attempt to protect his assets.

6.      The other point that the defendants make is to show that the $205,000.00 loan was usurious and void.  Section 3.7 of the promissory note for the $205,000 clearly takes this transaction outside of the usury statute by automatically amending the note to reduce any amount of interest payable to a rate which is legal.  Therefore, as a matter of law the $205,000.00 loan was not usurious.  Even if Sharbat had actually paid an illegal rate of interest the only thing he could get back would be the difference between the highest legal rate and the usurious rate.  The entire loan would not be forfeited.

7.      The claim of the defendants that the acknowledgement of the $20,000 amount due plus the SpongeTech shares for the previous transaction whereby defendants took

8.      Furthermore, the obligation on the "acknowledgement" was confirmed by Sharbat as a <u>separate</u> obligation in the August 28, 2009 e-mail to Hartstein.  (Hartstein Affidavit, Exhibit A)

9.      Based upon the terms of the note and the acknowledgment and the proof that all of the money claimed in the complaint was paid by Hartstein according to Sharbat's directions (see wire transfers from Hartstein's bank attached as Hartstein Affidavit, Exhibit B) there is certainly a reasonable probability of Hartstein succeeding on the merits.

10.     So far as defendants' counterclaims are concerned, Hartstein had no knowledge of any counterclaims at the time the motion for an attachment was made.  Furthermore, nowhere in any of the e-mails is there any claim that Sharbat has counterclaims against Hartstein.

11.     Sharbat came to me to represent him on some other claims against third parties unrelated to the transactions involved here because he knew that I represented Hartstein on similar claims.  At no time did he mention to me any possible counterclaims against Hartstein.  In fact, it later became clear that one of the reasons Sharbat hoped to collect money from Butler was to be able to pay off his obligations to Hartstein.

12.     Certainly, if defendants had counterclaims against Hartstein they would not have come to me to represent them as Solomon Sharbat specifically told me that the reason they came to me as opposed to another attorney was that he knew that I represented Hartstein.

13.     Now let us examine the validity of the counterclaims themselves.  They are without basis as set forth in Hartstein's affidavit ¶ 17 and are interposed solely for the purpose of posturing.

14.     All of the transactions which are the subject of defendants' counterclaims are referred to in the e-mails between plaintiff and Solomon Sharbat and in none of them does he ever make any kind of complaint that Hartstein breached any duty to him.  The counterclaims are not made out of whole cloth but are spun from the proverbial gossamer thread.  They show that if anyone breached any duty it was defendant Sharbat who continuously disregarded his obligations in failing to deliver stock, failing to repay moneys taken and completely disregarding his promises.

16.     With regard to the motion to disqualify me as attorney for the plaintiff, I should not be disqualified and Hartstein wants me to continue as his attorney.

17.     On Friday, October 2, 2009, Sharbat contacted me telling me that he had heard that I had done a very good job recovering money owed by Marcus Butler to Barry

5

18.     Sharbat misrepresented himself that his interests were aligned with those of Honig and Hartstein against Butler.

19.     Sharbat did not disclose that Hartstein had a claim against him. He also did not say that he thought that Hartstein had a claim against him. He certainly knew that Hartstein had a claim against him by October 2, 2009, given the emails between him and Hartstein, of which I knew nothing at the time.

20.     Our discussions on October 2, 2009, only revolved around his claims against Butler. On that basis my office immediately prepared a retainer letter for Sharbat to sign. As part of the retention he was to deposit a $10,000 retainer check in my firm bank account.

21.     Sharbat's first email to me was at 11:43 am. His emails consisted of forwarding emails related to the Butler matter. The September 27, 2009, email he refers to in his affidavit ¶22 was not privileged as it was also sent to Butler and in fact in the form it was sent to me it was forwarded as part of an exchange of emails between him and Butler.

22.     Shortly thereafter, I discovered from Honig and Hartstein that Sharbat had really attempted to defraud me by obtaining my services on false pretenses. It turns out they had a claim against Sharbat and said they did not want me representing Sharbat.

23.     That very same day, Friday, at 1:54 p.m., I sent an email to Sharbat informing him that I was now aware of the conflict and that unless Honig, et al., would be willing to

24.     On October 5, 2009, at 7:49 a.m., Sharbat asked me legal advice by email as to what to do with checks from Butler.  I did not respond to that email but told Sharbat not to deposit the retainer check in my account, as I could not represent him.

25.     At that point there was some discussion as to whether there would be a meeting on Tuesday between Honig and Sharbat to settle matters.  That meeting did not materialize.

26.     On October 6, 2009, I spoke with Sharbat and told him I could not represent him.  I followed that up with an email at 1:47 p.m. to confirm that I could not represent him.  **(Exhibit B)**

27.     At first Sharbat seemed to understand why I could not represent him.

28.     Then, in an email, Sharbat feigned confusion so I followed up with another email at 3:39 p.m. in which I again restated that I did not represent him.  In response to his pleadings that he did not want to fight with Hartstein and wanted to join with Honig and Hartstein against Butler, I explained to him repeatedly that he would have to first clear his obligations to Hartstein. **(Exhibit C)**

29.     Only after I told Sharbat that I do not represent him did he begin to explain his side of the story in his dispute with Hartstein and ask me, as Hartstein's attorney, to help resolve the dispute.

30.     I believe that the Sharbat only intends to muddy this litigation.  He contacted me on false pretenses claiming to be on Hartstein's side.  I believe that he has added

31.     There is nothing unethical in what I have done and, in fact, when Sharbat's counsel raised this issue, I spoke with other attorneys to ensure that I was not acting unethically and they felt that I had acted properly and had been duped momentarily by Sharbat.

32.     Sharbat has unclean hands here.  Anything he disclosed to me was while he knew full well that I represented Hartstein.

33.     Information that Sharbat had accounts at Blue Trading and TD Bank came independently from Hartstein and we sent copies of the restraining order to those entities solely based on a list of Sharbat account locations provided by Hartstein.

34.     I have reviewed the few emails I have from and to Sharbat and they consist of (1) emails that were between him and Butler and are not privileged (2) emails in which he asks what to do about the Butler checks and (3) emails regarding the whether I can represent him.  There is no information that is of any value to Hartstein in his litigation against Sharbat.  Hartstein has not asked me for them nor have I.  Sharbat will produce most of them anyways in light of his counterclaims.

35.     Michael Hartstein wants me to continue to represent him in this and other matters and he should have that right.

36. For all of the above reasons, I respectfully submit that the motion to vacate should be denied and the motion to disqualify me should be denied. I further submit that so far as the matter of tying up millions of dollars is concerned the court should fashion an order granting plaintiff permission to attach only the $400,000 that is legitimately owed in this matter.

Respectfully submitted,

*/s/ E. David Smith*

_____
E. David Smith